IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


SHATIKA L. ROBINSON                )
                                   )
v.                                 )        No. 3:10-1117
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security    )


To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's

claim for Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff is not disabled under the Act is supported by

substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion

for judgment on the administrative record (Docket Entry No. 12) should be denied.


## I. INTRODUCTION

The plaintiff filed an application for SSI on February 25, 2008, alleging a disability onset

date of January 1, 2008, due to posttraumatic stress disorder ("PTSD"), depression, and carpal tunnel

syndrome. (Tr. 56-57.) Her applications were denied initially and upon reconsideration. (Tr. 64-66,

71-72.) A hearing before Administrative Law Judge ("ALJ") Barbara Kimmelman was held on March 10, 2010. (Tr. 29-52.) The ALJ delivered an unfavorable decision on April 20, 2010 (tr. 10-21), and the plaintiff sought review by the Appeals Council. (Tr. 6.) On September 24, 2010, the Appeals Council denied the plaintiff's request for review (tr. 1-3), and the ALJ's decision became the final decision of the Commissioner.

## II. BACKGROUND

The plaintiff was born on January 28, 1974, and was 33 years old as of January 1, 2008, her alleged onset date. (Tr. 58.) On her March 13, 2008, Disability Report, the plaintiff reported that she completed tenth grade and that she did not attend special education classes. (Tr. 135.) However, she testified at her hearing that she completed the eighth grade and did attend special education classes. (Tr. 32.) She worked as a cashier, housekeeper, and in a warehouse. (Tr. 131.) The plaintiff is five feet tall, and during her alleged period of disability, weighed between 147 and 159 pounds, except during her pregnancy, when she weighed up to 173 pounds. (Tr. 231-338.)

### A. Chronological Background: Procedural Developments and Medical Records

On November 18, 2007, the plaintiff presented to the Emergency Department of Centennial Medical Center ("CMC") complaining of numbness in the fingers of her left hand. (Tr. 201.) Dr. Mark Byram diagnosed her with acute paresthesia of the upper left extremity. *Id.* Dr. Byram "discussed the possibility of this being a carpal tunnel syndrome" and advised the plaintiff to follow-up with her primary care provider. *Id.*

On January 4, 2008, the plaintiff presented to Mental Health Cooperative ("MHC") with complaints of "daily depressed mood, constant worry, decreased appetite, decreased sleep, forgetfulness, problems with concentration, irritability, crying spells, feelings of hopelessness, anhedonia, and racing thoughts." (Tr. 256.) She related that she has no suicidal ideation, "has never been able to hold a job because she cannot deal with people," that "she hears voices or knocking," that she has problems with anger, and that "[s]he admits to jumping on people or trying to cut them because she say or do [sic] something to anger her." *Id.* Donna Kreuze, an MHC case worker, determined that the plaintiff had marked difficulty with daily living activities; extreme difficulty with interpersonal functioning; moderate difficulty in maintaining concentration, task performance, and pace; and marked difficulty in her ability to adapt to changed circumstances. (Tr. 260-61.) Ms. Kreuze diagnosed the plaintiff with major depressive disorder ("MDD") with psychotic features, bipolar affective disorder, and PTSD; concluded that she had a "severe and persistent mental illness;"[1] and assigned her a Global Assessment of Functioning ("GAF") score of 39.[2] (Tr. 256, 262.)

On January 22, 2008, the plaintiff returned to MHC with complaints of depression, anxiety, lack of sleep, hypervigilance, paranoia, and aural and visual hallucinations. (Tr. 249.) The plaintiff reported that she had been abused by her uncle as a child, that she hears a male voice threatening to kill her, that she sees her uncle's face, and that she has flashbacks. *Id.* Amanda Westlake, a nurse

---

[1] Persons with "severe and persistent mental illness" are "recently severely impaired" and the duration of their severe impairment totals six months or more during the past year. (Tr. 262.)

[2] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score of 31-40 falls within the range of "[s]ome impairment in reality testing or communication [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."

practitioner at MHC, diagnosed the plaintiff with MDD and PTSD and prescribed Zoloft.[3] (Tr. 249.) On February 11, 2008, the plaintiff again returned to MHC and Ms. Westlake also prescribed Risperdal.[4] (Tr. 247.)

From February of 2008, to April of 2008, MHC case manager Maisha Faulkner regularly checked on the plaintiff at her residence. (Tr. 242-46.) The plaintiff reported that her medication was working and that she was feeling better. *Id.* The plaintiff reported to Ms. Westlake that there had been improvement in her anxiety and depression, and Ms. Westlake continued to prescribe Zoloft and Risperdal. (Tr. 241-42.)

On April 4, 2008, Dr. Katharyn B. Sherrod, Ph.D., an examining consultative psychologist, completed a Tennessee Disability Determination Services ("DDS") psychological evaluation (tr. 203-08) and noted that the plaintiff "was of average weight," had an unremarkable gait, and "sat and stood with ease." (Tr. 203.) The plaintiff related that she was depressed, that she did not have suicidal ideations, that she hallucinates and sees things, that she "failed the first, fifth, and sixth grades," that she "was in special education classes," and that she is able to prepare simple meals, "perform all household chores unassisted," drive, and do her own grocery shopping. (Tr. 203-05.) Dr. Sherrod determined that the plaintiff "appeared oriented to person, place, and circumstance" and noted that the plaintiff "did not exert adequate effort on testing tasks," was "suspected of making intentional errors," and exaggerated the severity of her symptoms. (Tr. 206-07.) Dr. Sherrod concluded that the plaintiff functioned at the "borderline to low average range of

---

[3] Zoloft is a selective serotonin re-uptake inhibitor that is used to treat depression, panic attacks, and anxiety. Saunders at 779.

[4] Risperdal is an antipsychotic that is prescribed to treat schizophrenia and bipolar disorder. Saunders at 618.

intelligence," diagnosed her with malingering and an antisocial personality disorder, and assigned her a GAF score of 60.[5] (Tr. 207-08.)  Additionally, Dr. Sherrod found that the plaintiff's memory, ability to concentrate, and adaptive functioning were not limited and that although her social skills were moderately limited, "it is possible that she exaggerated her aggression to make herself appear less functional . . . ." (Tr. 208.)

On April 22, 2008, the plaintiff presented to MHC and reported that she had suicidal ideations and planned to jump off a bridge, overdose, or hang herself. (Tr. 236.)  The plaintiff also reported overdosing on pills in an attempt to commit suicide.[6] (Tr. 238.)  The plaintiff tested positive for cocaine, but denied using any alcohol or controlled substances.[7] (Tr. 236-37)

On April 29, 2008, Dr. Robert L. Paul, Ph.D., a nonexamining DDS consultative psychologist, completed a Psychiatric Review Technique Form ("PRTF") (tr. 209-21) and diagnosed the plaintiff with borderline to low average intelligence, MDD, PTSD, and a personality disorder. (Tr. 210, 212, 214, 216.)  He concluded that the plaintiff had mild restriction of activities of daily living, moderate difficulties maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation. (Tr. 219.)

---

[5] A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.

[6] The record reflects that in 2008, the plaintiff had reported that she had tried to throw herself into the Cumberland River but was "pulled back by friends and family" (tr. 298), and that she had previously cut her wrists and ingested a half bottle of aspirin when she was age 20 and age 23, respectively. (Tr. 299.)  However, there is nothing in the record reflecting that she received any medical or psychiatric care after any suicide attempts.

[7] The plaintiff related to Ms. Faulkner that she tested positive for cocaine because the testing facility "switched her urine with someone else's at the clinic." (Tr. 278.)  The plaintiff took a second drug test on June 9, 2008, and the results were negative (Tr. 339.)

Dr. Paul also completed a mental Residual Functional Capacity ("RFC") assessment and opined that the plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; in her "ability to maintain attention and concentration for extended periods;" in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" in her "ability to work in coordination with or proximity to others without being distracted by them;" in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" in her "ability to interact appropriately with the general public;" in her "ability to accept instructions and respond appropriately to criticism from supervisors;" in her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" in her "ability to maintain appropriate behavior and to adhere to basic standards of neatness and cleanliness;" and in her "ability to set realistic goals or make plans independently of others." (Tr. 222-23.)  On May 6, 2008, the plaintiff reported to Ms. Faulkner that she was doing "ok" and that "she can tell that the medicine is helping her [because] she quit taking it for a couple of days and could see the difference." (Tr. 233.)

On May 10, 2008, Dr. Louise G. Patikas, a nonexamining DDS physician, completed a DDS medical consultant analysis and determined that the plaintiff's left hand numbness was not severe. (Tr. 226-29.)  She noted that the plaintiff's allegations of hand pain were not entirely credible because the plaintiff did not follow-up with a physician after her November 18, 2007, emergency room visit. (Tr. 229.)

On June 9, 2008, the plaintiff presented to Ms. Westlake with complaints of depressed mood, irritability, and crying (Tr. 276.) Ms. Westlake continued to diagnose her with MDD with psychotic

features and PTSD and to prescribe Risperdal and Zoloft. (Tr. 277.)  In July and August of 2008, the plaintiff reported to Ms. Faulkner that she takes her medicine every day and "has no concerns," and that taking her medication makes her "more social." (Tr. 280-86.)

In September 2008, the plaintiff reported to Ms. Faulkner that she had stopped taking her medication because she was pregnant. (Tr. 283.)  On September 24, 2008, the plaintiff presented to Dr. Kevin Collen, Medical Director for Clinic Services at MHC, and reported that her depression and mood swings increased after she stopped taking her medication. (Tr. 284.)  He diagnosed her with MDD and PTSD and prescribed Zoloft and Risperdal. (Tr. 285.)

On October 9, 2008, Ms. Faulkner completed a CRG form and found that the plaintiff had mild restrictions in activities of daily living; moderate restrictions in concentration, task performance, pace, and adaptation to change; and marked restrictions in interpersonal functioning. (Tr. 272-73.) Ms. Faulkner noted that the plaintiff was a "Formerly Severely Impaired Individual"[8] and assigned her a GAF score of 45.[9] (Tr. 274.)  Between October and November of 2008, the plaintiff reported to Ms. Faulkner that she was doing "ok," that she had "no concerns" with her physical health, and that she becomes depressed and has difficulty controlling her anger when she does not take her medication. (Tr. 287-90.)  On November 11, 2008, the plaintiff presented to Mary Phillips, a nurse practitioner at MHC, and related that she had not been taking her medications and that she was depressed. (Tr. 291.)  Ms. Phillips diagnosed the plaintiff with MDD and PTSD and prescribed Zoloft and Risperdal. (Tr. 292.)

---

[8] A person who is Formerly Severely Impaired is "not recently severely impaired but [has] been severely impaired in the past and need[s] services to prevent relapse." (Tr. 274.)

[9] A GAF score of 41-50 falls within the range of "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

Between December of 2008, and February of 2009, the plaintiff related to Shakena Williams, a case manager at MHC, that she was doing "ok," that she did not have any physical health problems, that she has mood swings and suicidal ideations when she runs out of medication, and that her medications were not working. (Tr. 293-97, 300.) In February and March of 2009, the plaintiff presented to Carrie Brensike, an MHC nurse practitioner, and related that she was taking her medications but that she did not think the medications were "doing anything;" that she was angry, irritable, and agitated; that her mood was "awful;" and that she "sometimes[ ] hear[s] things;" but that she had no suicidal ideation. (Tr. 298-99, 301-02.) Ms. Brensike diagnosed the plaintiff with MDD with psychotic features and PTSD and prescribed Zoloft, Zyprexa Zydis,[10] and Risperdal. *Id*. However, the plaintiff reported that Zyprexa had been "helpful in calm[ing] [her] down." (Tr. 301.)

Between March and May of 2009, Ms. Williams met with the plaintiff on multiple occasions, but her progress notes were unremarkable. (Tr. 303-308.) On June 2, 2009, the plaintiff reported to Ms. Williams that she was doing "ok," but that she was feeling depressed and did not think her medication was working. (Tr. 309.) On June 3, 2009, the plaintiff returned to Ms. Brensike with complaints of mood variation, being easily angered and worried "that someone is coming for [her]," and hearing helicopters over her apartment which made her nervous. (Tr. 310.) Ms. Brensike continued to diagnose the plaintiff with MDD and PTSD and prescribed Prozac,[11] Zyprexa, Zoloft, and Risperdal. (Tr. 311.)

On June 29, 2009, the plaintiff related to Ms. Faulkner that she was "doing ok." (Tr. 312.) On July 1, 2009, Ms. Faulkner completed a CRG form and determined that the plaintiff had mild

---

[10] Zyprexa is used to treat bipolar disorder, depression, and schizophrenia. Saunders at 782.

[11] Prozac is an antidepressant that can be used to treat panic disorder. Saunders at 591.

restrictions in activities of daily living; moderate restrictions in concentration, task performance, and pace; and marked restrictions in interpersonal functioning and adaptation to change. (Tr. 269-70.) Ms. Faulkner concluded that the plaintiff had a "severe and persistent mental illness" and assigned her a GAF score of 45. (Tr. 271.)

On July 23, 2009, the plaintiff presented to Ms. Brensike and related that she was having difficulty sleeping, had a decreased appetite, had mood swings, was hearing voices, was having "disturbing thoughts toward other people and self," and was angry and depressed. (Tr. 315.) Ms. Brensike diagnosed the plaintiff with bipolar affective disorder ("BPAD") and PTSD and prescribed Benadryl,[12] Prozac, and Zyprexa. (Tr. 316.) On July 29, 2009, the plaintiff returned to Ms. Brensike and reported that she was sleeping better, was less irritable, was less agitated, and was anxious and depressed "at times." (Tr. 317.)

In July and August of 2009, the plaintiff reported to Ms. Faulkner that she was doing "ok," "that she has been getting more sleep and hasn't been as angry," that she thought her medicine is "working," but that she also was stressed out, that "she is tired of dealing with people and is going to snap on somebody," and that she had back pain. (Tr. 319-22.)

On August 25, 2009, Ms. Brensike completed a mental Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") (tr. 265-67) and found that the plaintiff was moderately limited in her ability to understand, remember, and carry out simple instructions and in her "ability to make judgments on simple work-related decisions, and that she was markedly limited in her ability to understand, remember, and carry out complex instructions; in her "ability to make judgments on complex work related decisions;" in her ability to interact

_____

[12] Benadryl is an antihistamine, decongestant, and sleep aid. Saunders at 86-87.

appropriately with the public, supervisors, and co-workers; and in her ability to "[r]espond appropriately to usual work situations and to changes in a routine work setting." (Tr. 265-66.) Ms. Brensike noted that the plaintiff's "extreme emotional lability and paranoia make interactions with others difficult." (Tr. 266.) On August 26, 2009, the plaintiff returned to Ms. Brensike and reported that, although she is calmer, she still feels depressed and anxious. (Tr. 323.) Ms. Brensike diagnosed her with bipolar disorder NOS and PTSD and prescribed Lamotrigine,[13] Benadryl, and Zyprexa. (Tr. 324.)

On September 23, 2009, Dr. Stephen Mory, a psychiatrist at MHC, examined the plaintiff. (Tr. 329.) The plaintiff related that she had a good appetite, that "sleep is good," and that her mood was stable. *Id.* Dr. Mory noted that Lamotrigine worked well with the plaintiff's other medications, diagnosed her with bipolar disorder and PTSD, and prescribed Lamotrigine, Zyprexa, and Benadryl. *Id.* Between September and November of 2009, the plaintiff related to Ms. Faulkner that she was doing "ok," and that she had "no concerns with her medicine at this time" or with her physical health. (Tr. 326, 333, 338.)

On October 21, 2009, the plaintiff presented to Ms. Brensike and related that she has mood instability, depression, and anxiety; that her sleeping has improved; and that she has been "utilizing [B]enadryl [ ] with positive results." (Tr. 335.) Ms. Brensike continued to diagnose the plaintiff with bipolar disorder and PTSD and prescribed Lamotrigine, Zyprexa, and Benadryl. (Tr. 336.)

On November 24, 2009, Dr. Vanessa Elliott, Ph.D., a consultative examining psychologist, completed a psycho-educational evaluation (tr. 345-47), during which time the plaintiff related that she was expelled from school in ninth grade "for fighting" and that she has suicidal ideations.

---

[13] Lamotrigine is prescribed for seizures and bipolar disorder. Saunders at 396-97.

(Tr. 345.) Dr. Elliot found that the plaintiff "was oriented to person, place, and time;" that she had

no behavioral abnormalities and no hallucinations; and that although her "general effort level is

questionable . . . [her] response pattern was more so a reflection of her defensiveness regarding her

limitations rather than a deliberate feigning of deficits." (Tr. 346.) Dr. Elliot determined that the

plaintiff had a verbal IQ score of 60, a performance IQ score of 56, and a full scale IQ score of 54,

and that her basic academic skills in reading and math were on a third grade level. Dr. Elliot

diagnosed the plaintiff with bipolar disorder, PTSD, and "rule out mild intellectual disability," and

assigned her a GAF score of 60. (Tr. 347.) Further, Dr. Elliott opined that the plaintiff would "likely

to continue to struggle with educational activity and gainful employment" due to her "longstanding

learning difficulties and currently measured deficits." *Id.*

### B. Hearing Testimony

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and

Dr. Gordon Doss, a vocational expert ("VE"), testified. (Tr. 27-52.) The plaintiff testified that she

had completed eight years of schooling, that she was placed in special education classes, and that

she has difficulty reading and with arithmetic. (Tr. 32-33.) She related that she has never used

cocaine, despite testing positive for it in 2008, and that she used marijuana between the ages of four

and seven when her uncle gave it to her while he molested her. (Tr. 34-35.) The plaintiff testified

that she first presented to MHC in January of 2008, and that she was diagnosed with bipolar

disorder, PTSD, and MDD. (Tr. 35.) She related that her prescribed medications "don't really help

[her] too much" and that she "still get[s] upset a little bit." (Tr. 36.)

The plaintiff testified that she has had "difficulties with the law," including "[a] lot of aggravated assault, fighting people, arson charges, [and] reckless endangerment with a deadly weapon." (Tr. 36.) She related that has been fired from several jobs because she has difficulty getting along with people, that she hears voices each day that tell her to hurt people, that she hallucinates, that she has difficulty with her memory and with concentrating, and that she has anxiety. (Tr. 37-39.) The plaintiff explained that she helps her children get ready for school and occasionally does chores but that she spends most of her day resting and taking care of her baby. (Tr. 40.)

The plaintiff testified that she gets "nervous being around a lot of people" and that she last worked at a hotel in 2001, but was fired after she "got into it with the supervisor of housekeeping." (Tr. 41-42.) She related that she is not able to work because she is "really scared that [she is] going to hurt somebody," she does not "get along with anybody on a job," and she does not trust anyone. (Tr. 42.) The plaintiff testified that although her medications were helpful, she still gets upset and becomes irritable when taking them. (Tr. 43-44.)

The VE confirmed that his testimony would be consistent with the Dictionary of Occupational Titles ("DOT") and testified that the plaintiff had not performed any substantial gainful activity. (Tr. 46.) The ALJ asked the VE what type of work would be available to the plaintiff if she could perform "simple, routine, repetitive tasks but must avoid being around the public and only occasionally have superficial contact." *Id.* The VE answered that she could work as a cleaner at the medium and unskilled levels, as a kitchen helper at the medium and unskilled levels, as a house sitter at the light and unskilled levels, and as a stem mounter of light fixtures at the light and unskilled levels. (Tr. 46-47.) Next, the ALJ asked the VE what type of work the

plaintiff could perform if the plaintiff "had to avoid working with the public and . . . could less then occasionally work with coworkers and supervisors," and the VE replied that she would be precluded from working. (Tr. 48.)

The VE testified that for each of the ALJ's hypotheticals, he considered the plaintiff to have a marginal education. (Tr. 49-50.) The VE defined a marginal education as "any education scoring from grades one through six. And that's with testing, limited, anything below 11 and 12th or GED is considered an average education."[14] (Tr. 50.) The plaintiff's attorney asked the VE what type of work the plaintiff could perform if she had marked limitations in her ability to interact appropriately with the public, supervisors, coworkers, and in her ability to "respond appropriately to usual work situations" and "to changes in a routine work setting." (Tr. 51.) The VE answered that the plaintiff would be precluded from working. *Id.*

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on April 20, 2010. (Tr. 10-22.) Based on the record, the ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since February 25, 2008, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: mild intellectual disability, bipolar disorder, and posttraumatic stress disorder (20 CFR 416.920(c)).

* * *

_____

[14] The VE related that the definition of marginal education that he provided came from "the Chief Administrative Law Judge who gave [him] a couple days of training when [he] first began work." (Tr. 50.)

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

* * *

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can perform simple routine repetitive tasks, but must avoid being around the public and only occasionally have superficial contact with co-workers.

* * *

5.      The claimant has no past relevant work (20 CFR 416.965).

* * *

6.      The claimant was born on January 28, 1974 and was 34 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

* * *

10.     The claimant has not been under a disability, as defined in the Social Security Act, since February 25, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. 12-22.)

-14-

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to

support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Foster*, 853 F.2d at 490 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must

come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The five step inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five step process. (Tr. 21-22.) At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since January 1, 2008, her alleged onset date. (Tr. 12.) At step two, the ALJ determined that the plaintiff's mild intellectual disability, bipolar disorder, and PTSD were severe impairments. *Id.* At step three, the ALJ determined that the plaintiff's impairments, either singly or in combination,

did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* At step four, the ALJ determined that the plaintiff did not perform any past relevant work but that she had the RFC to perform a "full range of work at all exertional levels but with the following nonexertional limitations: she can perform simple routine repetitive tasks but must avoid being around the public and only occasionally have superficial contact with co-workers." (Tr. 14.) At step five, the ALJ concluded that the plaintiff could work as a hospital cleaner, kitchen helper, house sitter, light fixture stem-mounter, and maid/house cleaner. (Tr. 21-22.)

### C. The Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in determining that the plaintiff did not meet Listing 12.04, Listing12.06, or Listing 12.08. Docket Entry No. 12-1 at 7-13. Next, she argues that the ALJ erred in finding that she had the RFC "to perform a range of work at all exertional levels," in failing to consider all the record evidence, and in failing to assign proper weight to her treating sources. Docket Entry No. 12-1, at 13-18, 23-24. The plaintiff also contends that ALJ did not properly consider the effects of her obesity, failed to properly evaluate her subjective complaints of pain, and "erred in relying on the testimony of the [VE]." Docket Entry No. 12-1, at 20-24.

### 1. The ALJ properly considered the findings of the plaintiff's treating sources.

The plaintiff contends that the ALJ "erred by not giving proper weight to the opinion[s]" of her treating sources, Ms. Faulkner and Ms. Brensike. Docket Entry No. 12, at 18-20. According to the Regulations, there are three different medical sources who may provide evidence: nonexamining sources, nontreating sources, and treating sources. A nonexamining source is "a physician,

psychologist, or other acceptable medical source[15] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but who does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations define a treating source as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant.]" *Id.* The Regulations characterize "an ongoing treatment relationship" as a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the sources with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a nontreating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2) (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010) and *Hensley v. Astrue*, 573 F.3d 263 (6th Cir. 2009)). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

---

[15] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. § 416.927]* . . . .'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *4 (emphasis in original)). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 416.927(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *5 (citing 20 C.F.R. § 416.927(d)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[16] *Wilson*, 378 F.3d at 544-45.

In this case, Ms. Faulkner and Ms. Brensike are not acceptable treating sources. Although the plaintiff presented to both Ms. Faulkner and Ms. Brensike on numerous occasions (tr. 233, 242-46, 265- 67, 272-74, 280-90, 298-99, 301-02, 310-12, 315-26, 333-38), Ms. Faulkner is a case

---

[16] The rationale for the "good reason" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in her case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

manager and Ms. Brensike is a nurse practitioner, both of which are classified not as acceptable

medical sources but as "other sources."[17]  Social Security Ruling ("SSR") 06-03p noted that

> [w]ith the growth of managed health care in recent years and the emphasis on
> containing medical costs, medical sources who are not "acceptable medical sources,"
> such as nurse practitioners, physician assistants, and licensed clinical social workers,
> have increasingly assumed a greater percentage of treatment and evaluation functions
> previously handled primarily by physicians and psychologists. Opinions from these
> medical sources, who are not technically deemed "acceptable medical sources" under
> our rules, are important and should be evaluated on key issues such as impairment
> severity and functional effects, along with other relevant evidence in the file.

Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *3 (quoted in *Heaberlin v. Astrue*, 2010 WL 1485540,

at *4 (E.D. Ky. Apr. 12, 2010)).

Even though Ms. Faulkner and Ms. Brensike are not acceptable treating sources, and thus

the treating physician rule does not apply to them, the ALJ still must consider their medical findings.

Ms. Faulkner and Ms. Brensike are other treating sources, and the Regulations require the ALJ to

evaluate their medical findings in light of

> (1) the length of the treatment relationship and the frequency of examination; (2) the
> nature and extent of the treatment relationship; (3) the supportability of the opinion
> with respect to relevant evidence such as medical signs and laboratory findings;
> (4) the consistency of the opinion with the record as a whole; (5) the specialization

---

[17] The Regulations define other sources as

(1) Medical sources not listed in paragraph (a) of this section (for example,
nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists,
and therapists);

(2) Educational personnel (for example, school teachers, counselors, early
intervention team members, developmental center workers, and daycare center
workers);

(3) Public and private social welfare agency personnel; and

(4) Other non-medical sources (for example, spouses, parents and other caregivers,
siblings, other relatives, friends, neighbors, and clergy).

20 C.F.R. § 404.1513(d).

of the physician rendering the opinion; and (6) any other factor raised by the applicant.

20 C.F.R. § 416.927(d)(2)-(6).  SSR 06-03p further clarified the treatment of "other sources" by explaining that

> [a]lthough the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:
> • How long the source has known and how frequently the source has seen the individual;
> • How consistent the opinion is with other evidence;
> • The degree to which the source presents relevant evidence to support an opinion;
> • How well the source explains the opinion;
> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
> • Any other factors that tend to support or refute the opinion.

2006 WL 2329939, at *4-5 (quoted in *Roberts v. Astrue*, 2009 WL 1651523, at 7 (M.D. Tenn. June 11, 2009) (Wiseman, J.).

In this case, the ALJ focused on the factors of inconsistency and level of expertise in assigning no weight to Ms. Brensike's Medical Source Statement and little weight to Ms. Faulkner's CRG forms. (Tr. 19-20.)  The ALJ noted that

> Ms. Brensike indicated on a medical source statement that the claimant has marked limitations in several areas.  However, the medical records revealed that the claimant does well on her medications.  The claimant's mood swings and paranoia have significantly decreased, and the claimant has been reporting improved functioning and fewer symptoms.  The medical records showed the claimant had not been in any altercations since she has been getting mental health counseling and taking her medications.  The medical evidence further revealed that the claimant is able to function around others because she has a boyfriend and she cares for her children.  Thus, Ms. Brensike's assessment of the claimant's mental ability is not consistent with the medical evidence of the record, or the record as a whole, and therefore, the

undersigned gives no weight to Ms. Brensike's opinion regarding the severity of the claimant's bipolar disorder and PTSD.

*Id.* The ALJ also explained that the information provided by Ms. Faulkner on the CRG forms was inconsistent

> with the medical evidence because the claimant's treatment notes indicated that the claimant was doing fine with treatment and medications, and better than the ratings indicated. The medical evidence revealed the claimant shopped for groceries for her family and attended classes in order to receive financial assistance from the Families First program. Also, the claimant indicated that she had no problems with her leisure activities. Thus, the claimant's actions demonstrated that she is able to function around others. Furthermore, the GAF scores noted on the CRG forms are not consistent with the plaintiff's statements that she is doing fine, that she is able to care for her children and herself, and that she has been able to function around others when she goes to the grocery store and attends appointments.

(Tr. 20.)

Although Ms. Brensike concluded that the plaintiff was markedly limited in her ability to understand, remember, and carry out complex instructions; in her "ability to make judgments on complex work related decisions;" in her ability to interact appropriately with the public, supervisors, and co-workers; and in her ability to "[r]espond appropriately to usual work situations and to changes in a routine work setting" (tr. 265-66), and Ms. Faulkner concluded that she had marked restrictions in interpersonal functioning and adaptation to change (tr. 269-70, 272-73), the plaintiff reported on multiple occasions that she was doing "okay" (tr. 233, 287-90, 293, 309, 312, 319, 326, 333, 338), that the severity of her depression and mood swings increased when she did not take her medication (tr. 284, 289-90), and that her medications were "working" or made her feel better. (Tr. 233, 243-47, 280-86, 301, 311, 319, 326, 333, 338.) Additionally, the plaintiff related that she is able to take care of her children, drive, perform household chores, and shop for groceries. (Tr. 40, 205.)

In addition to discussing how the plaintiff's statements and activities of daily living belied Ms. Brensike's and Ms. Faulkner's findings, the ALJ noted that neither Ms. Brensike or Ms. Faulkner were trained psychologists or psychiatrists. (Tr.20.) As discussed *supra*, SSR 06-03p provides that when an ALJ assesses the medical findings of other sources, she should consider "[w]hether the source has a specialty or area of expertise related to the individual's impairment." 2006 WL 2329939, at *4-5. Although Ms. Brensike and Ms. Faulkner are mental health professionals, the record contains evaluations by mental health providers with a greater degree of expertise that indicate that the plaintiff's mental impairments did not markedly affect her ability to function. Dr. Sherrod, Dr. Paul, and Dr. Phay, three consultative psychologists who assessed the plaintiff's mental limitations, all concluded that her memory, ability to concentrate, adaptive functioning, and social functioning were, at most, moderately limited. (Tr. 208, 219, 222-23, 264.)

In sum, Ms. Brensike's Medical Source Statement and Ms. Faulkner's CRG forms were inconsistent with the plaintiff's own statements, her daily activities, and the medical findings of three consultative psychologists. Therefore, the ALJ did not err in assigning no weight to Ms. Brensike's Medical Source Statement and in assigning little weight to Ms. Faulkner's CRG forms. She focused on the factors of inconsistency and level of expertise, provided "good reasons," as required by SSR 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2)), and there is substantial evidence in the record to support her determination.

**2. The ALJ properly concluded that the plaintiff did not meet Listing 12.04, Listing 12.06, or Listing 12.08.[18]**

**a. Listing 12.04**

The plaintiff argues that she meets the criteria of Listing 12.04 for affective disorders, Listing 12.06 for anxiety related disorders, and Listing 12.08 for personality disorders and that she is entitled to a finding of disability at step three of the five step sequential evaluation process. Docket Entry No. 12-1 at 7-13; 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06, 12.08.

The plaintiff has the burden of proof at steps one through four of the sequential disability benefits analysis, including proving presumptive disability by meeting or exceeding a Medical Listing at step three. *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D. Ky. Aug. 15, 2008) (quoting *Her*, 203 F.3d at 391). Thus, the plaintiff has the burden of proof at step three to demonstrate that "[she] has or equals an impairment" listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Little*, 2008 WL 3849937, at *4 (quoting *Arnold v. Comm'r of Soc. Sec.*, 238 F.2d 419, 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)). The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of the criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). At step three,

> [i]f the claimant is *not performing substantial gainful work* and has a severe impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and [her] impairment (or impairments) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is disabled without further inquiry.

---

[18] Because it was not raised in the plaintiff's brief, the Court will not consider whether the plaintiff meets the criteria for Listing 12.05, despite the plaintiff's notably low IQ score. *See* Tr. 346.

*Little*, 2008 WL 3849937, at *1 (emphasis added). If the plaintiff demonstrates that her impairment meets or equals a listed impairment, then the ALJ must find the plaintiff disabled. *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).

Listing 12.04 mandates a finding of disability when the requirements of both sections 12.04A and 12.04B are met, or when the requirements of section 12.04C are met. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. The plaintiff asserts that she meets sections A and B of Listing 12.04 since she was diagnosed with MDD and bipolar disorder. Docket Entry No. 12-1, at 7-8. To meet the requirements of Section A(1) for depressive syndrome, the plaintiff must show that her depression was characterized by at least four of the following nine characteristics: anhedonia or "pervasive loss of interest in almost all activities;" appetite disturbance with weight change; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; or hallucinations, delusions, or paranoid thinking. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04A1. *See also Bush v. Astrue*, 2011 WL 3444072, at *7-8 (M.D. Tenn. Aug. 8, 2011) (Nixon, J.). The plaintiff was diagnosed with MDD on multiple occasions (tr. 241, 247, 249, 262, 277, 285, 292-97, 311) and reported anhedonia (tr. 256), sleep disturbances (tr. 249, 256, 284, 315), psychomotor agitation or retardation (tr. 249, 256, 276, 301, 310, 335), feelings of worthlessness (tr. 236, 238, 256), difficulty concentrating (tr. 256), thoughts of suicide (tr. 236, 238, 294, 315), and hallucinations (tr. 203, 249), and thus satisfied the requirements of section A(1) of Listing 12.04. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04A(1) Additionally, the plaintiff was diagnosed on multiple occasions with bipolar disorder that was

manifested through mood swings (tr. 316, 318, 324, 329, 336, 347), and thus satisfied the requirements of section A(3) of Listing 12.04. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04A3.

Next, the plaintiff must satisfy the requirements of section B of Listing 12.04 for both her MDD and bipolar disorder. The Regulations provide that "[t]he criteria in paragraph[] B . . . describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A. In order to be found functionally limited under paragraph B, at least two of the following four restrictions must be present: a marked restriction of activities of daily living;[19] marked difficulties in maintaining social functioning;[20] marked difficulties in maintaining concentration, persistence, or pace;[21] or repeated episodes of decompensation,[22] each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04B. In

---

[19] Pursuant to the regulations:
[a]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.
20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C1.

[20] The regulations define social functioning as "your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C2.

[21] The regulations define concentration, persistence, or pace as being "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C3.

[22] The regulations define episodes of decompensation as
exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence,

relying on the CRG forms of Ms. Faulkner and Ms. Kreuze (tr. 260-62, 272-74), the plaintiff contends that she meets the requirements of section 12.04B since she has "a marked restriction in activities of daily living and [] marked difficulties in maintaining social functioning." Docket Entry No. 12-1 at 8. However, the ALJ correctly awarded little weight to Ms. Kreuze's CRG form and, as discussed *supra*, to Ms. Faulkner's CRG form. (Tr. 20.)

First, there is a discrepancy between the findings of Ms. Kreuze and Ms. Faulkner. Ms. Kreuze opined that the plaintiff had marked difficulty with activities of daily living (tr. 260-61), but Ms. Faulkner twice concluded that she only had mild restrictions in activities of daily living. (Tr. 269-70, 272-73.) Next, as the ALJ pointed out, Ms. Kreuze and Ms. Faulkner are not licensed psychologists or psychiatrists (tr. 20) and three separate consultative psychologists who assessed the plaintiff's mental limitations each concluded that her activities of daily living and her social skills

---

or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C4 (emphasis in original).

were only moderately limited. (Tr. 208, 219, 264.) The plaintiff also related that she is able to take care of her children, drive, perform household chores, and shop for groceries. (Tr. 40, 205.)

Additionally, the plaintiff did not meet the two remaining factors of section B of Listing 12.04, i.e., having marked difficulty in maintaining concentration, persistence, or pace or having repeated episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04B. All of the mental health care sources who evaluated the plaintiff classified her difficulties in maintaining concentration, persistence, and pace as no more severe than "moderate" (tr. 219, 222, 223, 261, 273) and the record indicates that she did not have repeated episodes of decompensation. (Tr. 219.) The plaintiff did not provide specific examples of decompensation that lasted for at least two weeks, as required by the Regulations, and related that the severity of her depression and mood swings increased when she did not take her medication (tr. 284, 289-90) and that her medications were worked or made her feel better. (Tr. 233, 243-47, 280-86, 301, 311, 319, 326, 333, 338.) Thus, there is substantial evidence to support the ALJ's finding that the plaintiff did not meet the requirements of section B of Listing 12.04.

After analyzing the plaintiff's claim for benefits under section 12.04B, the ALJ properly determined the plaintiff does not meet the criteria under section 12.04C. Section 12.04C requires a plaintiff to provide "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04C. The plaintiff must show "repeated episodes of decompensation, each of extended duration," "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be

-30-

predicted to cause the individual to decompensate," or a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." *Id.* The ALJ correctly noted that the record does not indicate that the plaintiff had repeated episodes of decompensation, had a residual disease process, or was not able to function outside of a highly structured or supportive living arrangement. (Tr. 13.) Thus, the ALJ properly determined that the plaintiff did not meet section C of Listing 12.04.

In sum, the plaintiff satisfied the requirements of section A of Listing 12.04 but she did not meet the requirements for section B or section C for the Listing and therefore does not meet Listing 12.04.

### b. Listings 12.06 and 12.08

The plaintiff also argues that she meets Listing 12.06 for anxiety disorders and Listing 12.08 for personality disorders. Docket Entry No. 12-1 at 8-13. Listing 12.06 mandates a finding of disability when the requirements of sections 12.06A and 12.06B are met, or when the requirements of section 12.06C are met.[23] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. Section A requires the plaintiff to show that she has a medical history of generalized persistent anxiety that is accompanied by three out of the four of the following symptoms or signs: (a) motor tension, (b) automatic hyperactivity, (c) apprehensive expectation, or (d) vigilance and scanning; or must be accompanied by a "persistent irrational fear of a specific object, activity, or situation;" "[r]ecurrent severe panic

---

[23] The Court will only address sections A and B of Listing 12.06 and not section C, since the plaintiff specifically contends that she meets sections A and B and not section C. Docket Entry No. 12-1, at 8-10.

attacks;" "[r]ecurrent obsessions or compulsions;" or "[r]ecurrent and intrusive recollections of a traumatic experience." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06A.

Assuming arguendo that the plaintiff satisfies section A of Listing 12.06, the plaintiff must then meet the requirements of section B of the Listing and this is where her argument falls short. In order to be found functionally limited under section B, at least two of the following four restrictions must be present: a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06B. As discussed *supra*, the ALJ correctly determined that the plaintiff's limitations in any of these categories were, at worst, moderate limitations and that she did not have repeated episodes of decompensation. (Tr. 13.) Since the plaintiff failed to satisfy the requirements for section B of Listing 12.06, she does not meet Listing 12.06.

Listing 12.08 mandates a finding of disability when the requirements of sections 12.08A and 12.08B are met. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.08. Section A requires the plaintiff to show "[d]eeply ingrained, maladaptive patterns of behavior associated with one of the following:" "[s]eclusiveness or autistic thinking;" "[p]athologically inappropriate suspiciousness or hostility;" "[o]ddities of thought, perception, speech and behavior;" "[p]ersistent disturbances of mood or affect;" "[p]athological dependence, passivity, or aggressivity;" or "[i]ntense and unstable interpersonal relationships and impulsive and damaging behavior." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.08A. The plaintiff correctly contends that she met the requirements of section A of Listing 12.08 because the record indicates that she did have "[p]ersistent disturbances of mood or affect." (Tr. 236, 249, 256, 276, 293-97, 300, 315, 335.)

In order to be found functionally limited under section B of Listing 12.08, at least two of the following four restrictions must be present: a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.08B.  Yet, as was the case with section B of Listing 12.04 and 12.06, the ALJ correctly determined that the plaintiff does not have any marked restrictions and did not have repeated episodes of decompensation. (Tr. 13.)  Since the plaintiff failed to satisfy the requirements for section B of Listing 12.08, she does not meet Listing 12.08.

### c. Testimony from a medical expert is not necessary.

The plaintiff contends that remand is necessary because no medical expert testified about whether the plaintiff's disorders are equivalent to any of the Listings in section 12.00 in accordance with SSR 96-6p. Docket Entry No. 12-1, at 12.  SSR 96-6p provides that an ALJ is required to obtain an updated medical opinion on the issue of equivalency from a medical expert only

> [w]hen no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or
> When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

1996 WL 374180, at *3-4.  As the defendant correctly points out, the ALJ "explicitly explained" that the medical evidence in the record "did not support a finding that [the plaintiff's] impairments equaled a listing" and the ALJ "did not indicate that any additional evidence [that] was received . . . would have changed the State agency psychological consultants' conclusions that [the plaintiff's]

mental impairments were not equivalent in severity to a Listing." Docket Entry No. 15, at 19-20; (Tr. 12-13).

The plaintiff contends that the state agency psychologists never considered Dr. Elliot's psycho-educational evaluation, since it was completed after the state agency psychologists evaluated the plaintiff's mental impairments, and that, if state agency psychologists had considered the evaluation, it likely would have changed their determinations. Docket Entry No. 12-1, at 12. However, Dr. Elliot's psycho-educational evaluation indicates that the plaintiff's limitations were moderate, a finding that corresponds to the findings of the state agency psychologists. (Tr. 345-47.) Dr. Elliot opined that the plaintiff "was oriented to person, place, and time;" that she had no behavioral abnormalities and no hallucinations; and that "[a]lthough [her] general effort level is questionable . . . [her] response pattern was more so a reflection of her defensiveness regarding her limitations rather than a deliberate feigning of deficits." (Tr. 346.)  She also assigned the plaintiff a GAF score of 60 (tr. 34), indicating "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.  Since the plaintiff did not satisfy either requirement of SSR 96-6p, the ALJ was not required to obtain the opinion of a medical expert on the issue of equivalency.


### 3. The ALJ did not err in concluding that the plaintiff had the RFC "to perform a full range of work at all exertional levels."

The plaintiff argues that the ALJ erred in determining that she had the RFC to perform work at all levels of exertion since she has carpal tunnel syndrome, was assigned GAF scores of 39 and 45, and was advised by Dr. Elliot "to contact the Social Security Administration to determine if she meets criteria for disability services." Docket Entry No. 12-1, at 13-15.  The ALJ found that the

plaintiff had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can perform simple repetitive tasks, she must avoid being around the public and only occasionally have superficial contact with co-workers." (Tr. 20.)

In making a disability determination, an ALJ must consider evidence of all of the plaintiff's symptoms, including objective evidence, such as medical signs and laboratory findings, and subjective evidence, such as statements made by the plaintiff or her treating and non-treating sources. 20 C.F.R. §§ 404.1529(a), 404.929(a). In this case, the ALJ properly considered the record evidence in making her RFC determination. (Tr. 14-20.) First, the record does not reveal a diagnosis of a severe physical impairment. (Tr. 201-347.) On November 18, 2007, Dr. Byram diagnosed the plaintiff with acute paresthesia of the upper left extremity, "discussed the possibility of this carpal tunnel syndrome," and advised her to follow-up with her primary care provider. (Tr. 201.) The plaintiff did not address her possible carpal tunnel syndrome until May 10, 2008, when she presented to Dr. Patikas. (Tr. 226-29.) Dr. Patikas concluded that the plaintiff's left hand numbness was not severe, that there was "no evidence of functional limitation due to alleged [left] hand numbness," and that her allegations of pain were not entirely credible since she did not follow-up with a physician as instructed by the emergency room doctor. (Tr. 229.)

The plaintiff next argues that her GAF score of 39 indicates that she has "a major impairment in the area of work" and that her GAF score of 45 indicates that she has "a serious impairment in occupational functioning and was eligible for disability." Docket Entry No. 12-1, at 14. In *Bratton v. Astrue*, 2010 WL 2901856, at *8 (M.D. Tenn. July 19, 2010) (Nixon, J.), this Court noted that "[a] GAF score can be helpful in assessing an individual's mental RFC." However, the Court also explained that

> [a]t the same time, the Sixth Circuit recognizes that a GAF score is a physician's subjective evaluation and not raw medical data. *Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. 2007). The Commissioner explicitly denies endorsing use of the GAF scale in Social Security disability programs, and states that "[i]t does not have a direct correlation to the severity requirements in our mental disorders listings." 65 Fed.Reg. 50,745, 50,764-765 (Aug. 21, 2000); see also *Kennedy*, 247 Fed. Appx. at 766; *DeBoard v. Comm'r Soc. Sec.*, 211 Fed. Appx. 411 (6th Cir. 2006). In *Kennedy*, the Sixth Circuit rejected an ALJ's finding of an "improvement in mental functioning" based on improved GAF scores when there was not other substantial evidence in the record to support the finding. *Kennedy*, 247 Fed. Appx. at 766.

*Bratton*, 2010 WL 2901856, at *8. *See also Oliver v. Comm'r of Soc. Sec.*, 415 Fed. Appx. 681, 684 (6th Cir. Mar. 17, 2011) ("A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues."); *Smith v. Astrue*, 565 F. Supp. 2d 918, 924-25 (M.D. Tenn. 2008) (Wiseman, J.). Therefore, while a GAF score is not dispositive in determining an individual's mental RFC, it can be one of several factors weighed or considered in assessing an individual's mental RFC. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 n.7 (6th Cir. Feb. 9, 2006) ("A GAF score may help an ALJ assess mental RFC, but it is not raw medical data."). The ALJ considered the plaintiff's GAF score of 39, assigned by Ms. Kreuze on January 4, 2008, and her GAF score of 45, assigned by Ms. Faulkner on July 1, 2009, but did not assign either score significant weight since the scores were not consistent with the plaintiff's treatment notes, her own statements regarding how she was doing, and her activities of daily living.[24] (Tr. 15-16, 20.)

The plaintiff also contends that Dr. Elliot, "by encouraging the claimant to file for disability, and stating that she will 'continue to struggle' with gainful employment . . . is indicating that the claimant cannot perform a full range of work at any exertional level." Docket Entry No. 12-1, at 15.

---

[24] In contrast, on April 4, 2008, Dr. Sherrod assigned the plaintiff a GAF score of 60 (tr. 207-08), and on November 24, 2009, Dr. Elliot assigned her a GAF score of 60. (Tr. 347.)

While Dr. Elliot did note that the plaintiff would "likely continue to struggle with educational activity and gainful employment" due to her "longstanding learning difficulties and currently measured deficits" (tr. 347), the plaintiff erroneously interprets Dr. Elliot's opinion to mean that she concluded that the plaintiff is not able to perform "a full range of work at any level." Docket Entry No. 12-1, at 15. First, the Regulations clearly provide that a "statement by a medical source that [the plaintiff] is 'disabled' or 'unable to work' does not mean" that the Commissioner will find the plaintiff disabled since that is a determination that is reserved for the Commissioner. 20 C.F.R. § 416.927(e)(1)-(2). Any findings submitted on issues reserved to the Commissioner, such as whether the plaintiff is "disabled" or "unable to work," are not entitled to any particular weight. 20 C.F.R. § 416.927(e)(3). *See also Gant v. Comm'r of Soc. Sec.*, 372 Fed.Appx. 582, 584-85 (6th Cir. Apr. 7, 2010) ("Conclusory medical opinions are properly discounted as only the Commissioner can make the ultimate determination of disability."); *Brock v. Comm'r of Soc. Sec.*, 368 Fed.Appx. 622, 625 (6th Cir. Mar. 8, 2010) (citing 20 C.F.R. § 404.1527(e)(3)) ("[N]o 'special significance' will be given to opinions of disability, even those made by the treating physician.").

Next, as discussed *supra*, Dr. Elliot's psycho-educational evaluation indicates that the plaintiff's limitations were moderate, which corresponds to the findings of the state agency psychologists. (Tr. 345-47.) Dr. Elliot opined that the plaintiff "was oriented to person, place, and time;" that she had no behavioral abnormalities and no hallucinations; and that "although her general effort level is questionable . . . [her] response pattern was more so a reflection of her defensiveness regarding her limitations rather than a deliberate feigning of deficits." (Tr. 346.) She also assigned the plaintiff a GAF score of 60 (tr. 347), which indicated that the plaintiff's impairments were moderate. DSM-IV-TR at 34.

Lastly, the ALJ did take into account the plaintiff's nonexertional limitations. Although she concluded that the plaintiff could perform a full range of work, she limited the plaintiff's ability to "perform simple routine repetitive tasks" and noted that the plaintiff "must avoid being around the public and only occasionally have superficial contact with co-workers." (Tr. 20.) In sum, the ALJ properly concluded that the plaintiff could perform a full range of work at all exertional levels with assigned nonexertional limitations and that determination is supported by substantial evidence in the record.

### 4. The ALJ properly considered all the relevant medical evidence.[25]

#### a. Evidence of Major Depressive Disorder and Antisocial Personality Disorder

The plaintiff argues the ALJ failed to properly consider her MDD and antisocial personality disorder because the ALJ "did not even mention the fact that the claimant had [MDD] for almost one and a half years" and she did not list antisocial personality disorder as one of the plaintiff's severe impairments. Docket Entry No. 12-1, at 15. However, as the defendant correctly points out, "the ALJ specifically assessed whether [the plaintiff's] impairments met the criteria for [] Listings 12.04 (affective disorders) and 12.08 (personality disorders)." Docket Entry No. 15, at 23. As explained *supra*, substantial evidence in the record supports the ALJ's determination that the plaintiff did not meet Listing 12.04 or 12.08. Further, the ALJ considered the plaintiff's anti-social personality disorder and MDD in determining her RFC because the ALJ gave "weight" to Dr. Sherrod's psychological evaluation (tr. 19), in which he diagnosed the plaintiff with an antisocial personality

---

[25] Given the similarity between the plaintiff's third and seventh assignments of error (Docket Entry No. 12-1, at 15-18, 23-24), the Court will address both assignments of error in this section.

disorder; because she gave "significant weight" to the findings of the DDS psychologists, which included Dr. Paul (tr. 20), and he had diagnosed the plaintiff with MDD and a personality disorder (tr. 212, 216); and because she limited the plaintiff's exposure to the public and limited her interaction with coworkers. (Tr. 14.)

The plaintiff next argues that the ALJ "failed to properly evaluate the claimant's mental impairments in accordance with 20 C.F.R. § 416.920a." Docket Entry No. 12-1, at 16-17. When assessing the severity of an individual's mental impairment, such as the plaintiff's affective disorder, anxiety related disorder, and personality disorder, the ALJ's written decision must include findings based upon a "special technique." 20 C.F.R. § 416.920a(a). The special technique is a series of steps delineated in subsections (b) through (e) of 20 C.F.R. § 416.920a. First, the ALJ is required to evaluate the plaintiff's "pertinent symptoms, signs, and laboratory findings to determine whether [the plaintiff has] a medically determinable mental impairment(s)."[26] 20 C.F.R. § 416.920a(b)(1). Next, the ALJ must assess the plaintiff's degree of functional limitation caused by the mental impairment. 20 C.F.R. § 416.920a(b)(2). The regulations acknowledge the individualized nature of this step by requiring the ALJ "to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the plaintiff's] overall degree of functional limitation." 20 C.F.R. § 416.920a(c)(1). Thus, the ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of [the plaintiff's] symptoms, and how [the plaintiff's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.*

---

[26] If the ALJ determines that the plaintiff has a medically determinable mental impairment, the ALJ must provide detailed support for such findings in accordance with 20 C.F.R. § 416.920a(e).

After considering all the available relevant evidence, the ALJ must rate the plaintiff's functional limitation in the four following functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 416.920a(c)(3). These four functional limitations are known as the "B" criteria. The term "B criteria" corresponds to the paragraph "B" criteria of the expansive list of mental disorders in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The regulations require the ALJ to attach a point value to each of the four functional areas. 20 C.F.R. § 416.920a(c)(4). For the first three categories, the regulations set forth a five-point assessment scale: none, mild, moderate, marked, and extreme. *Id.* The fourth category, episodes of decompensation, is rated with a four point scale: none, one or two, three, four or more. *Id.* "If the ALJ rates the first three functional areas as 'none' or 'mild' and the fourth area as 'none,' the impairment is generally not considered severe and the claimant is conclusively not disabled." *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir. 2009) (quoting 20 C.F.R. § 404.1520a(d)(1)).

The ALJ is also required to follow 20 C.F.R. § 416.920a(e) in documenting the application of the special technique. The ALJ's written decision must include the germane findings and conclusions based on the special technique; show the plaintiff's significant history, such as medical examinations and laboratory findings, and the functional limitations considered in determining the severity of the plaintiff's mental impairments; and provide a specific finding regarding the level of the plaintiff's limitation in each of the four functional areas listed in 20 C.F.R. § 416.920a(c)(3).[27]

---

[27] Since 2000, the ALJ is no longer required to complete a Psychiatric Review Technique Form ("PRTF"). *Rabbers,* 582 F.3d at 653-54. The regulations only require that an ALJ's written decision "'incorporate the pertinent findings and conclusions based on the [special] technique.'" *Id.* (quoting 20 C.F.R. § 404.1520a(e)(2)).

20 C.F.R. § 416.920a(e)(2). In this case the ALJ complied with 20 C.F.R. § 416.920a and properly applied the special technique. The ALJ determined that the plaintiff's activities of daily living were mildly restricted; that she had moderate difficulties with social functioning, concentration, persistence, or pace, and that she had no episodes of decompensation, and the ALJ supported her findings with substantial evidence from the record. (Tr. 12-13.) Thus, the ALJ clearly delineated the four functional areas that she considered and provided a specific finding for each before concluding that the plaintiff's affective disorder, anxiety related disorder, and personality disorder were not severe impairments. *See Rabbers* 582 F.3d at 653.

### b. Remand is not appropriate to consider evidence submitted after the plaintiff's hearing.

The plaintiff contends that remand is appropriate "to consider new and material evidence that was received after the hearing, which constitutes good cause for failure to incorporate such evidence into the record in a prior proceeding in accordance with 2 U.S.C. § 405(g)." Docket Entry No. 12-1 at 17-18. Specifically, the plaintiff requests that a May 2, 1985, Metropolitan Nashville Public School's ("Metro Public School") educational-psychological evaluation and an April 16, 1987, Metro Public School's psycho-educational assessment be considered on remand. *Id.* Newly submitted evidence that is not reviewed by the Commissioner can only be considered with a sentence six remand under 42 U.S.C. § 405(g).

The Court can require an ALJ to consider additional evidence on remand only if the plaintiff shows that the evidence is "new" and "material," and provides "good cause" for failing to include the evidence in the record prior to the ALJ's decision. 42 U.S.C. § 405(g). *See also Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 490–91 (6th Cir.2006); *Cline v. Comm'r of Soc. Sec.*,

96 F.3d 146, 148 (6th Cir.1996); *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).  As explained by the Sixth Circuit, "[f]or the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).  Further, new evidence is "'material' only if there is a reasonable possibility that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence," *Foster*, 279 F.3d at 357 (citing *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)), and "good cause" can be shown "by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357 (citing *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984) (per curiam)).

First, the Metro Public School assessments are not new evidence.  The two evaluations were completed in 1985 and 1987, which is well before the ALJ entered her decision on April 20, 2010.  (Tr. 22.)  The ALJ also did not provide any reasoning or explanation as to why the two reports were not available at the time of the administrative proceeding. Docket Entry No. 12-1, at 17-18.  Next, the plaintiff failed to show how her Metro Public School records are material. *Id.*  The plaintiff described the results of her Metro Public School evaluations (*id.*) but she failed explain how her school records would cause the ALJ to "reach[] a different disposition of the disability claim." *Foster*, 279 F.3d at 357 (citing *Sizemore*, 865 F.2d at 711).  The plaintiff asserts that her Metro Public School evaluations "shows [her] life-long mental problems and low intellectual functioning" but Dr. Elliot's psycho-educational evaluation (tr. 345-47) provides similar information and the ALJ assigned significant weight to that assessment. (Tr. 19.)  Finally, the plaintiff failed to show "good

cause" because she did not provide any "reasonable justification" as to why the reports were not "acquir[ed] and present[ed] [as] evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357 (citing *Willis*, 727 F.2d at 554). In sum, a sentence six remand is not appropriate because the plaintiff did not show that her Metro Public School evaluations were "new" and "material," and she did not provide "good cause" for failing to include the evaluations in the record prior to the ALJ's decision. 42 U.S.C. § 405(g).

### 5. The ALJ properly considered the plaintiff's obesity.

The plaintiff argues that the ALJ erred "in not properly considering Plaintiff's obesity and its effects on her ability to work." Docket Entry No. 12, at 20-21. SSR 02-01p, which details the Social Security Administration's ("SSA") policy on obesity, provides that even though the SSA no longer classifies obesity as a listed impairment, adjudicators must still consider its effects when evaluating an individual's residual functional capacity. Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *1. SSR 02-01p further explains that "[a]n assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment," 2000 WL 628049, at *6, but it does not offer "'any particular procedural mode of analysis for disability claimants.'" *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 442-43 (6th Cir. Aug. 12, 2010) (quoting *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 412 (6th Cir. Jan. 31, 2006)).

The plaintiff correctly points out that an ALJ is allowed to use her "judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating source has not indicated a diagnosis of obesity." Soc. Sec. Rul. 02-01p, 2000 WL 628049,

at *3.  Obesity is a severe impairment if "alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." *Id*. at *5.  As with other impairments, the plaintiff is generally charged with proving to the ALJ that she is disabled, and she must provide evidence that the ALJ can use to reach conclusions about her alleged medical impairments. *Cranfield v. Comm'r of Soc. Sec.*, 79 Fed. Appx. 852, 857 (6th Cir. 2003); 20 C.F.R. § 404.1512(a).

In this case, the record does not indicate that the plaintiff was diagnosed with obesity (tr. 201-347) and she does not provide any evidence that her weight hindered her ability to work. Further, when the plaintiff was asked by her attorney why she is not able to work, the plaintiff replied that she is "really scared that [she is] going to hurt somebody," that she has a problem with people being near her, that she does not trust anyone, and that she does not "get along with coworkers, supervisors or nothing." (Tr. 42.)  At her hearing, she never attributed her inability to work to obesity. (Tr. 29-52.)  Since the plaintiff did not provide any evidence as to how her alleged obesity affected her work, the ALJ "was not required to give obesity any express consideration" in her report. *Bush v. Astrue*, 2011 WL 344072, at *15 (M.D. Tenn. Aug. 8, 2011) (Nixon, J.).


### 6. The ALJ did not err in analyzing the plaintiff's credibility of her subjective complaints of psychological disorders.

The plaintiff contends that the ALJ erred in evaluating the credibility of her subjective complaints of psychological disorders by finding her not fully credible.  Docket Entry No. 15, at 32-35.  In evaluating the plaintiff's credibility, the ALJ noted that she must first determine whether the plaintiff has an underlying mental or physical impairment and that she must then assess the

"intensity, persistence, and limiting effects" of that impairment. (Tr. 14.)  The ALJ concluded that the

> treatment record and assessments do not support [the plaintiff's] claims of daily hallucinations, especially if she is compliant with her medications.  In addition, she said she forgets things and has problems concentrating on things.  However, she has been raising four small children as a single parent.  The claimant pointed out that she was feeling better on her medications and did not have any hallucinations until she stopped taking her medications when she was pregnant.  The claimant's activities of daily living consisted of her getting her children ready for school, caring for her infant, doing chores around the home, and sleeping.

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [the ALJ's] residual functional capacity assessment.

(Tr. 19.)

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ.  The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted).  However, "[i]f the ALJ rejects the claimant's complaints as incredible, [she] must clearly state [her] reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4.  In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5.  Consistency between the plaintiff's subjective complaints and the

record evidence "tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain her credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[28] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

In this case, the ALJ concluded that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," thus satisfying the first prong of the *Duncan* test. (Tr. 19.) Given that the second prong of the *Duncan* test consists of two alternatives,

---

[28] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[29]

In making her credibility determination, the ALJ relied on the plaintiff's daily activities, on the effectiveness of her medication, on her own statements, and on the medical records from examining and nonexamining sources. (Tr. 12-19.) As discussed *supra*, the plaintiff related that she is able to take care of her children, drive, perform household chores, and shop for groceries (tr. 17, 19, 40, 205); that she was doing "okay" (tr. 233, 287-90, 293, 309, 312, 319, 326, 333, 338); that the severity of her depression and mood swings increased when she did not take her medication (tr. 284, 289-90); and that her medications were "working" or made her feel better. (Tr. 233, 243-47, 280-86, 301, 311, 319, 326, 333, 338.) Further, three separate consultative psychologists who

---

[29] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

assessed the plaintiff's mental limitations each concluded that her activities of daily living and her social skills were only moderately limited (tr. 208, 219, 264), and all of the mental health care sources who evaluated her classified her difficulties in maintaining concentration, persistence, and pace as no more severe than "moderate." (Tr. 219, 222, 223, 261, 273.)

In sum, the plaintiff's daily activities, the effectiveness of her medication, her own statements, and the medical records from examining and nonexamining sources demonstrate that her physical impairments cause her a certain amount of pain, but that same record medical evidence does not support the plaintiff's subjective complaints that her pain is disabling.

### 7. The ALJ did not err in relying on the VE's testimony.

The plaintiff contends that the "ALJ failed to consider the claimant's subjective complaints and limitations, mental conditions, and mental limitations in determining the claimant's residual functional capacity and in questioning the vocational expert." Docket Entry No. 12-1, at 24. The Regulations allow ALJs to rely on a VE at step five to determine whether a plaintiff is able to perform any work. 20 C.F.R. § 404.1560(c). The VE's testimony, in response to an ALJ's hypothetical question, will be considered substantial evidence "'only if that hypothetical question accurately portrays [the plaintiff's] individual physical and mental impairments.'" *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir.1987)). Although a hypothetical must accurately portray a plaintiff's impairments, an ALJ is required to incorporate only those limitations that she accepts as credible. *Infantado v. Astrue* 263 Fed. Appx. 469, 476-77 (6th Cir. 2009); *Griffeth*, 217 Fed. Appx. at 429.

As discussed in detail above, the ALJ, after evaluating the record medical evidence and the plaintiff's own statements, properly assessed the plaintiff's "subjective complaints and limitations, mental conditions, and mental limitations" (Docket Entry No. 12-1, at 24), and the hypotheticals that she asked the VE reflected those assessments. (Tr. 45-50.) The ALJ concluded that the plaintiff could perform a full range of work at all exertional levels but that she "must avoid being around the public and only occasionally have superficial contact with co-workers" (tr. 14), and this RFC determination is supported by substantial evidence in the record.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) be DENIED and that this action be DISMISSED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

_____
JULIET GRIFFIN
United States Magistrate Judge